**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| STERIS CORPORATION and UNITED STATES ENDOSCOPY GROUP, INC., | CASE NO. <u>1:25-cv-2778</u> |
| Plaintiffs, | JUDGE |
| v. | **COMPLAINT** |
| FREDERICK HALLER and ENDOLASTIC, INC., | |
| Defendants. | |

Plaintiffs STERIS Corporation ("STERIS") and United States Endoscopy Group ("US Endoscopy") (collectively, "Plaintiffs"), for their Complaint against Defendants Frederick Haller ("Haller") and Endolastic Inc. ("Endolastic") (collectively, "Defendants"), allege as set forth below.

## NATURE OF THE ACTION

1.      Through an acquisition that occurred in December 2020, US Endoscopy, a wholly-owned subsidiary of STERIS, acquired the assets of Intelligent Endoscopy, LLC ("Intelligent Endoscopy"), including its SMARTBAND technology and all of its intellectual property and certain contract rights, for $6,000,000.

2.      In exchange for the purchase price, Haller and Intelligent Endoscopy assigned all of Intelligent Endoscopy's intellectual property, inventions, contract rights, and trade secrets to US Endoscopy. Haller further agreed to keep Intelligent Endoscopy's—now US Endoscopy's—confidential and proprietary information secret, and to not use such information for himself.

3.      As a part of the sale, Intelligent Endoscopy also sold and US Endoscopy acquired the rights that Intelligent Endoscopy held in intellectual property that Haller or other Intelligent

1

Endoscopy employees developed during the course and scope of their employment with Intelligent Endoscopy.

4.      On December 21, 2020, STERIS also offered Haller a job. In a newly created role as Director, Research & Development, Banding Products, Haller would be responsible for iterating on US Endoscopy's newly-acquired intellectual property and developing new endoscopic banding products, techniques, and methodologies for STERIS.

5.      As part of his Employment Agreement, Haller agreed to assign to STERIS any inventions or trade secrets that he developed while employed by STERIS and to keep confidential and proprietary information secret, and to not use such information for himself. A true and correct copy of Haller's Employment Agreement is attached hereto as Exhibit A.[1]

6.      Haller took the money and the job.

7.      But in 2024, Haller formed a new competing company, Endolastic, Inc. ("Endolastic") relying on a simple, but improper business model: instead of developing new or different products for Endolastic, Haller took the intellectual property that he had already sold to US Endoscopy, and the intellectual property that he developed for STERIS, and developed nearly identical products and techniques for Endolastic meant to compete directly with STERIS's products.

8.      In furtherance of that goal, Endolastic is in the process of raising funds, obtaining regulatory clearances, and expanding its business operations.  According to Endolastic's Q2 2025 Investor Update, Haller and Endolastic have valued Endolastic at a $20M post-money valuation. *See* https://endolastic.com/.

---

[1] When Haller executed his Employment Agreement, he returned pages 1 and 3 of the Employment Agreement to STERIS, but did not return page 2. STERIS has included a copy of a blank Employment Agreement, which contains all 3 pages, with a copy of Haller's executed Employment Agreement.

9. Haller and Endolastic have no right to use STERIS's or US Endoscopy's intellectual property. Neither STERIS nor US Endoscopy agreed that Haller or Endolastic could use their intellectual property, confidential information, or trade secrets. Further, neither STERIS nor US Endoscopy ever agreed to license their intellectual property or trade secrets to Haller or Endolastic.

**PARTIES**

10. Plaintiff STERIS is incorporated in Ohio. STERIS's principal place of business and headquarters is in Mentor, Lake County, Ohio.

11. Plaintiff US Endoscopy is a wholly-owned subsidiary of STERIS and is incorporated in Ohio.  US Endoscopy's principal place of business is in Mentor, Ohio.

12. Defendant Haller is a resident of Forsyth County, North Carolina.

13. Defendant Endolastic, Inc. ("Endolastic") is a Delaware corporation headquartered in Forsyth County, North Carolina. On information and belief, Haller is the co-founder and chief executive officer of Endolastic.

**JURISDICTION AND VENUE**

14. This is a civil action concerning Haller's and/or Endolastic's breaches of contract, conversion, tortious interference, and misappropriation of trade secrets.

15. This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because STERIS's and US Endoscopy's claims arise under Defend Trade Secret Act, 18 U.S.C. § 1836(b), *et seq*. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because STERIS's and US Endoscopy's claims for violation of the Ohio Uniform Trade Secrets Act, breach of contract, conversion, and tortious interference form part of the same case or controversy as STERIS's and US Endoscopy's DTSA claims.

16.     This Court also has diversity jurisdiction over STERIS's and US Endoscopy's Claims pursuant to 28 U.S.C. § 1332 because Haller is a citizen of the state of North Carolina and both STERIS and US Endoscopy are citizens of a foreign state, and the amount in controversy exceeds $75,000.00.

17.     This Court has personal jurisdiction over Haller because, in the Asset Purchase Agreement ("APA") (a true and correct copy of the APA is attached hereto as Exhibit B) in which Haller was a party, Haller contractually agreed that "any claim relating to this Agreement shall be brought solely in the state or federal court of competent jurisdiction located in Lake County, Ohio, and all objections to personal jurisdiction and venue in any action, suit or proceeding so commenced are hereby expressly waived by all parties hereto." APA § 10.10.

18.     Further, this Court has personal jurisdiction over Haller because, in the Employment Agreement Haller signed with STERIS ("Employment Agreement"), Haller contractually agreed that Haller "consent[s] to venue and personal jurisdiction" over him in "the courts of the State of Ohio, including the federal courts, for purposes of construction and enforcement of this Agreement." Ex. A, Employment Agreement, ¶ 15.

19.     Further, this Court has personal jurisdiction over Haller because, in the 2021 and 2022 Restricted Stock Agreements Haller signed with STERIS ("Restricted Stock Agreements") (true and correct copies of the 2021 and 2022 Restricted Stock Agreements are attached hereto as Exhibits C and D, respectively), which included additional Nondisclosure and Noncompetition Agreements between Haller and STERIS ("Nondisclosure and Noncompetition Agreements"), Haller contractually agreed that "[a]ny unresolved dispute shall be submitted exclusively to the jurisdiction of the courts of Lake County,  Ohio." *See* Ex. C, ¶ 16.

20.     This Court has personal jurisdiction over Endolastic because Endolastic has sufficient minimum contacts with the forum state that are related to the present action, and because exercising personal jurisdiction over Endolastic is fair and reasonable under the circumstances.

21.     Upon information and belief, Endolastic, through its agent Haller, has reached into Ohio to misappropriate the trade secrets and other confidential information of Ohio corporations STERIS and US Endoscopy.

22.     Upon information and belief, at all times relevant hereto, Endolastic was and/or is systematically directing and/or targeting its business activities at consumers in the United States, including Ohio, through its online website, Endolastic.com, which is accessible throughout the United States, including in this District. Haller utilized his personal LinkedIn account to advertise Endolastic     (https://www.linkedin.com/posts/fritz-haller_most-people-dont-realize-the-scale-of-whats-activity-7398782481224622080-QA5H) and engaged the audience to connect with him for more information. LinkedIn is an online website which is accessible throughout the United States, including in this District.

23.     Endolastic has further systematically directed and/or targeted its business activities at consumers (i.e., medical professionals) in the United States, including Ohio, through podcast interviews posted on YouTube, in which Haller, in his capacity as Endolastic's chief executive officer and co-founder, promotes Endolastic's products and solicits investment for Endolastic. *See* "The     Interventional     Endoscopist     Podcast:     Fritz     Haller,"     posted     5/19/2025, https://www.youtube.com/watch?v=zRrgnU_5W9c; *see also* "Breakthrough for GERD & Obesity | Fritz Haller | S7 – E16," posted 11/17/2025, https://www.youtube.com/watch?v=NOsRon6rO8I. YouTube is an online website which is accessible throughout the United States, including in this District. On further information and belief, these podcast episodes are also available on other

5

electronic platforms, including Apple Podcasts and Spotify, which are accessible throughout the United States, including this District.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as this is the District where a "substantial part of the events or omissions giving rise to the claim occurred." Venue is further proper in this district because, as set forth above, Haller agreed to resolve disputes stemming from his myriad contracts with STERIS and/or US Endoscopy in this venue. Venue is further proper in this district because, on information and belief, Defendant Endolastic has regular business in this District and has committed acts of breach in this District.

## STATEMENT OF FACTS

**A.    STERIS and US Endoscopy Develop, Manufacture, Market, and Sell Medical Technology, Including Endoscopy Technology**

25.     STERIS is engaged in the business of infection prevention, decontamination, and surgical and is a critical care company, with a long list of products and services.

26.     In 2012, STERIS acquired US Endoscopy, a leader in the design, manufacture, and sale of therapeutic and diagnostic medical devices and accessories used in gastrointestinal endoscopy markets worldwide. STERIS and US Endoscopy currently develop endoscopy technology sold under STERIS branding.

**B.    US Endoscopy Enters Into An Asset Purchase Agreement With Intelligent Endoscopy And Haller And Acquires All Of Intelligent Endoscopy's Intellectual Property, Including All Of Haller's Inventions; And Haller Agrees To Maintain The Confidentiality Of The Acquired Assets And Agrees Not To Compete With The Business Of Developing, Manufacturing, Marketing Endoscopic Band Ligation Products For Five Years.**

27.      In 2020, STERIS and US Endoscopy sought to expand their global portfolio of endoscopy technology by acquiring the assets of a North Carolina-based company owned by Haller, Intelligent Endoscopy. Intelligent Endoscopy was in the business of developing,

manufacturing, marketing, and selling endoscopic band ligation products, including an endoscopy band ligation product, the SMARTBAND multi-band ligation system (the SMARTBAND System").

28.     The SMARTBAND System is used during bleed management procedures for banding esophageal varices and treatment of other gastrointestinal conditions.     The SMARTBAND System consists of a ligation handle with a universal connector, a loading device, an adaptor, and a barrel with bands. Endoscopists can use the SMARTBAND System to treat gastrointestinal bleeding from esophageal varices (burst swollen veins in the esophagus). Using an endoscope loaded with a SMARTBAND, an endoscopist locates and then ligates (ties off) the varice with the SMARTBAND System bands.

29.     Haller founded Intelligent Endoscopy in 2014 and was an equity holder of the company as of December 2020.  Haller was involved in all aspects of research and development for Intelligent Endoscopy and was the primary inventor for the technology developed by that company including concepts that were commercialized and patented and other concepts that remained under development.

30.     STERIS believed that US Endoscopy's acquisition of Intelligent Endoscopy and its portfolio of endoscopy technology would increase STERIS's visibility in global endoscopy technology markets. Intelligent Endoscopy developed and sold products in multiple global markets, making it a desirable acquisition target for STERIS, which hoped to increase sales in those markets.

31.     In preparation for the asset purchase, on December 18, 2020, Haller executed a Confidentiality and Invention Assignment Agreement with Intelligent Endoscopy (the "Confidentiality and Assignment Agreement") (a true and correct copy of the Confidentiality and

Assignment Agreement is attached hereto as Exhibit E). Among other things, Intelligent Endoscopy and Haller agreed that the Confidentiality and Assignment Agreement "is necessary to ensure the ownership of, and safeguard against the unauthorized disclosure or use of, the Confidential Information and to preserve the Company's goodwill and ongoing business value."

32.	The Confidentiality and Assignment Agreement defines "Confidential Information" as follows:

> 2.	Definition.	"**Confidential Information**" includes confidential and/or proprietary information regarding the Company, including the following: (1) information regarding the Company's business, operations, assets, liabilities or financial condition; (2) information regarding the Company's pricing, sales, merchandising, marketing, capital expenditures, costs, joint ventures, business alliances, purchasing or manufacturing; (3) information regarding the Company's employees or representatives, including their identities, responsibilities, competence and compensation; (4) information regarding the Company's current or prospective customers, including information regarding their purchasing patterns; (5) information regarding the Company's current or prospective vendors, suppliers, distributors or other business partners; (6) forecasts, projections, budgets and business plans regarding the Company; (7) information regarding the Company's planned or pending acquisitions, divestitures or other business combinations; (8) the Company's trade secrets and proprietary information; (9) technical information, patent disclosures and applications, copyright applications, sketches, drawings, blueprints, models, know-how, discoveries, inventions, improvements, techniques, processes, business methods, equipment, algorithms, software programs, software source documents and formulae, in each case regarding the Company's current, future or proposed products or services (including information concerning the Company's research, experimental work, development, design details and specifications, and engineering); and (10) the Company's website designs, website content, proposed domain names, and
>
> databases. Confidential Information shall not include information to the extent it (I) is generally known within the industry in which the Company operates or becomes generally known to the public other than as a result of a disclosure by Employee in violation of the terms of this Agreement or any fiduciary or common law duty owed by the Employee to the Company, or (II) is or becomes available to Employee on a non-confidential basis from a disclosure source that does not owe, is not bound by, or otherwise owes the Company or any of its affiliates a duty to not disclose the Confidential Information.

*See* Ex. E.

33.	Under the Confidentiality and Assignment Agreement, Haller assigned to Intelligent Endoscopy all inventions and other developments that he developed while employed by Intelligent Endoscopy as follows:

4.    Assignment of Inventions.  Any and all inventions, improvements, discoveries, designs, works of authorship, concepts or ideas, or expressions thereof, whether or not subject to patents, copyrights, trademarks or service mark protections, and whether or not reduced to practice, that are conceived or developed by Employee while engaged by the Company and which relate to or result from the actual or anticipated business, work, research or investigation of the Company (collectively, "**Inventions**"), shall be the sole and exclusive property of the Company.  Employee shall do all things reasonably requested by the Company to assign to and vest in the Company the entire right, title and interest to any such Inventions and to obtain full protection therefor.

*Id.*

34.    Thus, as of December 18, 2020, ***any and all*** "inventions, improvements, discoveries, designs, works of authorship, concepts or ideas, or expressions thereof, whether or not subject to patents, copyrights, trademarks or service mark protections, and whether or not reduced to practice, that are conceived or developed by [Haller] while engaged by [Intelligent Endoscopy] and which relate to or result from the actual or anticipated business, work, research or investigation of [Intelligent Endoscopy]" were "the sole and exclusive property of" Intelligent Endoscopy.

35.    Also under the Confidentiality and Assignment Agreement, Haller agreed to maintain the confidentiality of the Intelligent Endoscopy confidential information and agreed not to use or disclose any Intelligent Endoscopy confidential information, including trade secrets and other proprietary Intelligent Endoscopy information.  Haller further agreed to deliver to Intelligent Endoscopy all tangible items in his control that contained Intelligent Endoscopy confidential information.

36.    On December 21, 2020, US Endoscopy entered into the APA with Intelligent Endoscopy and other seller parties, Haller, Melissa Clark, James Jervey, and Buchanan Ventures, LLC (collectively, the "Seller Parties"). *See* Ex. B.

37.    In exchange for $6,000,000, and a potential earnout to Haller and other Seller Parties, Intelligent Endoscopy sold all of its assets to US Endoscopy, including "[a]ll Intellectual

Property owned by Seller or held for use by Seller in its operation of the business . . ." and "Assumed Contracts," which included all of Intelligent Endoscopy's rights under the Confidentiality and Assignment Agreement.

38.     It was important to US Endoscopy that it acquire all of Intelligent Endoscopy's intellectual property so that US Endoscopy could quickly incorporate Intelligent Endoscopy's portfolio of inventions and intellectual property into US Endoscopy's own intellectual property portfolio.

39.     The APA contained myriad provisions and representations and warranties to ensure that US Endoscopy acquired *all* of Intelligent Endoscopy's Business Intellectual Property. Under § 2.1.1(d) of the APA, the parties defined "Business Intellectual Property" to mean:

> (d)   Business Intellectual Property.   All Intellectual Property owned by Seller or held for use by Seller in its operation of the Business, including, without limitation, the name "Intelligent Endoscopy" and any variations or derivations thereof (collectively, the "Business Intellectual Property"), together with the goodwill and right to sue third-parties for past infringement or improper, unlawful or unfair use or disclosure of the Business Intellectual Property;

40. In Article 9 of the APA, the parties defined "Intellectual Property" as follows:

10

"Intellectual Property" means all rights arising from or in respect of any of the following in any jurisdiction throughout the world: (i) patents, patent applications, patent disclosures and inventions, including any continuations, divisionals, continuations-in-part, renewals and reissues for any of the foregoing (collectively "Patents"), (ii) internet domain names, trademarks, service marks, service names, trade dress rights, trade names, brand names, slogans, logos and corporate names and registrations and applications for registration thereof, together with all of the goodwill associated therewith (collectively, "Marks"), (iii) copyrights (registered or unregistered) and copyrightable works, including web pages, websites and related content, whether or not copyrightable, and registrations and applications for registration thereof, and mask works and registrations and applications for registration thereof ("Copyrights"), (iv) computer software, (specifically excluding all shrink wrap software), data, data bases and documentation thereof, (v) trade secrets and other confidential and proprietary information (including ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial and marketing plans and customer and supplier lists and information) (collectively, "Trade Secrets"), (vi) accounts with Twitter, Facebook and other social media companies and the content found thereon and related thereto, (vii) copies and tangible embodiments thereof (in whatever form or medium), and (viii) all rights to any actions of any nature available to or being pursued by Seller to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages.

*See* Ex. B, APA.

41.     Thus, Haller represented in the APA that Intelligent Endoscopy owned and possessed all right and interest to the Business Intellectual Property as used at the time of the sale, that this Business Intellectual Property was all of the Intellectual Property necessary to operate the Business at the time, that Intelligent Endoscopy owned all manufacturing know-how used in the operation of the Business, and that the Business Intellectual Property included all manufacturing know-how used by Intelligent Endoscopy.

42.     As part of the APA, Haller further represented that Intelligent Endoscopy sold to US Endoscopy all intellectual property necessary to operate Intelligent Endoscopy.

43.     To ensure that US Endoscopy had purchased substantially all of Intelligent Endoscopy's intellectual property assets, Haller and the other Seller Parties agreed that each former or current Intelligent Endoscopy employee "has executed a written Contract assigning to

[Intelligent Endoscopy] all rights to any inventions made or other rights to the Intellectual Property inuring to such employee or independent contractor, during or derived from such employee's or independent contractor's relationship with [Intelligent Endoscopy]. . . ." Ex. B, § 3.8(i).

44.     Haller indeed executed such a "written Contract"—namely, his December 18, 2020, Confidentiality and Assignment Agreement. There is no question Haller assigned the rights to *all* inventions and developments he created at Intelligent Endoscopy to Intelligent Endoscopy, who then sold them to US Endoscopy. The Confidentiality and Assignment Agreement was included as an Assumed Contract that US Endoscopy acquired under the APA.

45.     Haller and the Seller Parties further agreed that that each former or current Intelligent Endoscopy employee "has executed a written Contract prohibiting disclosure of trade secrets . . . ." Again, Haller executed such a contract when he signed the Confidentiality and Assignment Agreement.

46.     Through the APA, Haller also agreed to other confidentiality obligations including that he would not disclose any confidential information related to the acquisition or US Endoscopy and that he would not use any such confidential information for his own benefit, or the benefit of others.

47.     In § 7.2.2 of the APA, Haller also agreed not to compete with US Endoscopy for five years following the execution of the APA:

12

7.2.2    Non-Competition.    In further consideration of the consummation of the transactions contemplated herein, the Seller Parties covenant and agree that until the fifth (5th) anniversary of the Closing Date (the "Non-Competition Period"), neither they nor their Affiliates shall, without the prior written consent of Buyer, either directly or indirectly, whether or not for consideration, (a) solicit business from, or otherwise compete with Buyer for the business of, any current or prospective customer of Buyer with respect to the Business for the purchase of services or products the same as or substantially similar to, or which may be otherwise used in substitution for, products or services manufactured, sold or provided by Buyer anywhere in North America, Germany, the United Kingdom or any other territory in which Seller sold products during the two (2) years prior to the Closing Date; (b) operate, control, advise, be engaged by, perform any consulting services for, invest in or otherwise become associated in any capacity with, any business, company, partnership, organization, proprietorship, or other entity, who or which, at any time during the Non-Competition Period, competes with the Business as then conducted by Buyer anywhere in North America, Germany, the United Kingdom or any other territory in which Seller sold products during the two (2) years prior to the Closing Date; or (c) engage in any practice the purpose of which is to evade the provisions of this covenant; provided, however, that nothing contained herein shall prevent the Seller Parties from acquiring an equity interest of up to two percent (2%) of an entity whose shares are traded on a national securities exchange or over-the-counter market.

**C.    Haller Joins STERIS, Agrees to Assign To STERIS All Inventions Made During His Employment, Agrees to Preserve The Confidentiality of STERIS's Confidential Information, And Agrees Not To Compete with STERIS.**

48.    Also on December 21, 2020, STERIS offered Haller a full-time job as Director, Research & Development, Banding Products, a newly created position, which Haller accepted. STERIS based Haller at its Clemmons, North Carolina facility. Haller's responsibilities included, among other things, driving growth and profitability for STERIS's banding/ligation product portfolio, and developing future ligation products, techniques, and methodologies.

49.    In light of the acquisition, STERIS envisioned that Haller would continue his work developing the SMARTBAND system and other SMARTBAND-related techniques. Haller's supervisor, Michael Smith, STERIS's Senior Director, Global Product Innovation, believed that Haller could use his prior experience as a leader at Intelligent Endoscopy to develop new ligation products and drive profitability for STERIS.

50.    Haller signed an Employment Agreement with STERIS. *See* Ex. A. Therein, Haller agreed that he would keep STERIS's proprietary or business-sensitive information confidential,

that, upon termination of his employment with STERIS, he would return all STERIS records and

documents, and that he would not compete with STERIS for one year following termination of his

employment with STERIS:

> 3.    CONFIDENTIALITY. [Haller] recognizes that such proprietary or business-sensitive information is the property of STERIS, and [Haller] shall not disclose to others (except as required in [Haller's] duties to STERIS), nor will [Haller] use for [Haller's] or another's benefit any such proprietary or business-sensitive information, either during [Haller's] employment with STERIS or thereafter.

> 4.    <u>RETURN OF RECORDS</u>. Employee shall, immediately upon termination of Employee's employment with STERIS, deliver to STERIS all records, reports, data, memoranda, notes, models, and equipment of any nature, prepared or acquired in Employee's course of employment with STERIS, in the possession or under the control of Employee. **Employee shall not take any such records, reports, data, memoranda, notes, models, or equipment, or copies or reproductions thereof, that relate to the business activities of STERIS** or to parties in a contract relationship with STERIS.

> . . .

> 10.    <u>NONCOMPETITION</u>. [Haller] shall not, for a period of one (1) year following the termination of [Haller's] employment with STERIS, whether by resignation or otherwise, engage, either directly or indirectly, as an employee, officer, director, shareholder, partner, or in any other capacity, in a business which is competitive with the business of STERIS. If [Haller] violates this covenant, the one (1) year period will begin to run from the date of judicial decree enforcing this Agreement.

Ex. C, Employment Agreement, ¶¶ 3, 4, 10 (emphasis added).

51.    Haller further agreed to assign to STERIS any Intellectual Developments he made

during his employment:

> 5.    <u>INVENTIONS, IDEAS, AND OTHER INTELLECTUAL DEVELOPMENTS</u>. In view of the purposes of STERIS and the need to secure for STERIS or Interested Parties (defined below), their right to Intellectual Developments (defined below) related to the business of STERIS or such Interested Party, [Haller] understands that STERIS must be in a position to use, assign, and otherwise dispose of Intellectual Developments made by its staff members and employees. Accordingly,

14

except for those items excluded by Paragraph 8 below, [Haller] shall promptly disclose to STERIS and, when requested, furnish to STERIS a complete record of every discovery, invention, improvement, innovation, design, copyright, and other definite and useful idea or compilation of information of value (individually and collectively an "Intellectual Development"), which [Haller] may make or originate, individually or with others, at any time during the term of [Haller]'s employment by STERIS. **[Haller] hereby assigns to STERIS or its nominee the entire rights throughout the world to such Intellectual Developments which relate to the current or potential business or activities of STERIS or any Interested Parties or which results from [Haller]'s work with STERIS.** The term "Interested Parties" means any person having a business relationship with STERIS where the relationship gives rise to a claim by that person to Intellectual Developments made by staff members and employees of STERIS.

*Id.* at ¶ 5 (emphasis added).

52.     Haller did not exclude any inventions, applications for patents, or copyrightable material from disclosure and assignment to STERIS. Haller thus agreed that all Intellectual Developments made during his time at STERIS belonged to STERIS.

53.     During his time at STERIS, Haller oversaw iterative improvements to STERIS's and US Endoscopy's SMARTBAND system portfolio and developed new products, methods, and procedural applications that he intended to introduce to the endoscopic band ligation market.

54.     With a focus on patentability Haller spent a significant portion of his working time researching and developing products and techniques for the treatment of (a) gastroesophageal reflux disease (commonly known as "GERD"), with a SMARTBAND-System-inspired concept focused on Antireflux band mucosectomy ("ARBM"), and (b) obesity, with a SMARTBAND System-inspired concept focused on Endoscopic Band-Assisted Gastroplasty ("EBG").   In addition to drafting text to include in patent applications, Haller drafted extensive business cases for ARBM and EBG related product concepts. In his business cases for the ARBM and EBG, Haller described the novelty of these new product concepts, techniques, and methodologies and

15

why they overcame the prior art. Haller sent these business cases and draft patent specifications and concepts to multiple STERIS employees, including Matthew Mottice, one of STERIS's in-house patent attorneys, and Haller's supervisor Michael Smith.

55.     STERIS retained the discretion to determine which business developments should be commercialized and publicly disclosed in patent applications and which business developments should be kept as confidential trade secrets. Although Haller proposed to senior STERIS employees that the ARBM and EBG developments should be commercialized and publicly disclosed through patent applications—even going so far as to draft potential patent applications—STERIS ultimately decided to keep these novel developments as confidential trade secrets.

**D.     Haller Agrees To Enter Into Long-Term Equity Incentive Plan Agreements, Which Contain Additional Restrictions on The Use And Disclosure of Confidential Information and Non-Competition.**

56.     During Haller's employment at STERIS, Haller entered into two Long-Term Equity Incentive Plan Agreements ("LTI") with STERIS, the first in 2021 which includes at least the 2021 Restricted Stock Agreement and 2021 Nondisclosure and Noncompetition Agreement ("2021 LTI"), *see* Ex. C, and the second in 2022, which includes at least the 2022 Restricted Stock Agreement and 2022 Nondisclosure and Noncompetition Agreement ("2022 LTI"), *see* Ex. D.[2]

57.     Under the 2021 and 2022 Restricted Stock Agreement, Haller agreed to receive shares of STERIS restricted stock pursuant to the 2021 LTI. In return Haller made a variety of promises under the 2021 and 2022 Nondisclosure and Noncompetition Agreements. Haller agreed to keep STERIS's invention records, trade secrets, and other confidential information in strict confidence and not disclose them to anyone or use them to further his own business or benefit, and

---

[2] STERIS represents that the 2021 and 2022 Nondisclosure and Noncompetition Agreements in Exs. C and D are substantially similar.

that, upon termination of his employment with STERIS, he would wait a period of two years to engage with a business which competes with STERIS, solicit customers, divert customers, or promote a company engaged in business competing with STERIS:

3.      *Nondisclosure.* Employee shall at all times hold in strictest confidence and not disclose or furnish to any person, firm, corporation, partnership, proprietorship, or other entity, or use for Employee's own benefit or on Employee's own behalf, confidential data, marketing strategies (including customer lists), invention records, trade secrets, and other confidential information of STERIS or its Affiliates, including, without limitation, information regarding customers, finances, or personnel, or concerning the products, systems, and services researched, developed, manufactured, assembled, sold, distributed, or performed by STERIS or otherwise concerning the business or affairs of STERIS and its Affiliates. This Section 3 shall not: (a) apply to any data, trade secret, or information that is or becomes generally available to or known by the public pursuant to the express consent of STERIS, (b) restrict Employee during the period of Employee's employment with STERIS from disclosing any data, trade secret, or information in furtherance and for the sole benefit of the business and affairs of STERIS, or (c) restrict Employee from disclosing any data, trade secret, or information that Employee is required to disclose under applicable law or regulation or by an order of a governmental agency or court, provided that, before making any disclosure referred to in this clause (c), Employee has first consulted with STERIS's General Counsel and given STERIS an opportunity to interpose an objection to the purported requirement that Employee is required to disclose the data, trade secret, or other information in question.

4.      *Noncompetition.*

(a)      Employee shall not, during the period of Employee's employment with STERIS or an Affiliate:

(i)      enter into or engage in any business which competes with the Company's Business (as defined below);

(ii)      solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the

Company's Business;

(iii)    divert, entice or otherwise take away any customers, business, patronage or orders of STERIS or its Affiliates or attempt to do so; or

(iv)    promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business.

(b)    Employee shall not, for a period of two years following the termination of Employee's employment with STERIS or an Affiliate:

(i)    enter into or engage in any business which competes with the Company's Business within the Restricted Territory (as defined in below);

(ii)    solicit customers, business, patronage or orders for, or sell, any products and services in competition with, or for any business, wherever located, that competes with, the Company's Business within the Restricted Territory;

(iii)    divert, entice or otherwise take away any customers, business, patronage or orders of STERIS or its Affiliates within the Restricted Territory, or attempt to do so; or

(iv)    promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's Business within the Restricted Territory.

(c)     *Indirect Competition*. For the purposes of Sections 4(a) and 4(b), inclusive, but without limitation thereof, Employee will be in violation thereof if Employee engages in any or all of the activities set forth therein directly as an individual on Employee's own account, or indirectly as a partner, joint venturer, employee, agent, salesperson, consultant, officer and/or director of any firm, association, partnership, corporation or other entity, or as a stockholder of any corporation in which Employee or Employee's spouse, child or parent owns, directly or indirectly, individually or in the aggregate, more than five percent (5%) of the outstanding stock.

(d)     *Extension*. If it shall be judicially determined that Employee has violated any of Employee's obligations under Section 4(b), then the period applicable to each obligation that Employee shall have been determined to have violated shall automatically be extended by a period of time equal in length to the period during which such violation(s) occurred.

(e)     *STERIS*. For the purposes of Sections 3, 4, 5 6, and 7 of this Agreement, STERIS shall also include any and all direct and indirect subsidiary, parent, affiliated, or related companies of STERIS for which Employee worked or had responsibility at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

(f)     *Definitions*. For the purposes of this Agreement, the following terms have the following meanings:

   (i)     "*Company's Business*" means the business of STERIS and its Affiliates of designing, manufacturing, distributing, selling, installing and maintaining or providing infection prevention and other procedural products and services, or those readily substitutable therefor, that are focused primarily on or related to healthcare, pharmaceutical and medical research markets.

   (ii)    "*Restricted Territory*" shall be defined as and limited to (A) the geographic area(s) within a seventy-five (75) mile radius of any and all location(s) of STERIS and its Affiliates in, to, or for which Employee worked, to which Employee was assigned or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination; and (B) all of the specific customer accounts, wherever located, with which Employee had any contact or for which Employee had any responsibility (either direct or supervisory) at the time of termination of Employee's employment and at any time during the two (2) year period prior to such termination.

*See* Ex. C, 2021 Nondisclosure and Noncompetition Agreement, §§ 3, 4.

### E.     STERIS Closes Its Clemmons, North Carolina facility

58.     Despite STERIS's hope that US Endoscopy's acquisition of Intelligent Endoscopy's assets would translate to an immediate increase in global sales, such anticipated growth never materialized. Faced with foreign regulatory challenges lingering from the COVID-19 pandemic and other issues, STERIS chose to restructure part of its endoscopy-related workforce

and close its Clemmons, North Carolina facility, where the SMARTBAND System products were manufactured.

59.     Haller was aware at least as early as April 2023 of STERIS's decision to close the Clemmons facility. In fact, Haller assisted in developing the communication plan intended to convey the restructuring decision to other affected employees and was aware that, as part of the restructuring, his position would likewise be eliminated. Haller and the other affected employees were repeatedly encouraged by Michael Smith and others at STERIS to apply for open internal positions in advance of the planned November 2023 closure date.

60.     Haller never applied for a single open position, though he had several months' notice of the Clemmons facility's impending November 2023 closure.

61.     Unbeknownst to STERIS or US Endoscopy, Haller had no intention of remaining with STERIS or applying for any of the available internal positions. Instead, Haller hatched a plan to form his own competing company, relying on the *intellectual property that he had sold or had developed while working for STERIS—in in exchange for substantial consideration.*

62.     During his time at STERIS, Haller sent multiple confidential STERIS documents to his personal email address in violation of STERIS policies, including, but not limited to, business proposal documents on or around January 24, 2023, drafts of patent claims on or around February 8, 2023, and drafts of patent application information on February 15, 2023. STERIS company policies in effect at that time including but not limited to its Confidential and Proprietary Records Policy, Conflicts of Interest Policy, and Code of Business Conduct prohibited all employees, including Haller, from distributing confidential and proprietary information outside the Company and using Company email systems and property for self-gain. Violation of such policies routinely results in disciplinary action including termination. Had Haller's multiple policy

violations been discovered by STERIS at that time, STERIS would have had cause to immediately terminate Haller's employment.

63.     Haller never returned any STERIS records or documents upon termination, despite his obligation to do so under the Employment Agreement. On information and belief, Haller still retains to this day confidential and proprietary records owned by STERIS and US Endoscopy.

**F.      Haller Forms Endolastic In January 2024, And Begins Competing Using STERIS's And US Endoscopy's Confidential Intellectual Property**

64.     On information and belief, Haller founded Endolastic in January 2024. Haller is the chief executive officer of Endolastic, Inc. Endolastic competes directly with STERIS and US Endoscopy in the endoscopic technology market.

65.     Haller has not developed any new or innovative products on behalf of Endolastic. Instead, he took STERIS's and US Endoscopy's intellectual property, confidential information, and trade secrets to develop products for Endolastic, raise money for Endolastic from investors, and compete directly with STERIS and US Endoscopy.

66.     On information and belief, Endolastic has relied upon Haller to provide it with STERIS's and US Endoscopy's trade secrets and other intellectual property, which it then used to promote its business across multiple online and electronic platforms, solicit money from investors, file trademarks, and seek regulatory approval from the U.S. Food and Drug Administration. According to Endolastic's Q2 2025 Investor Update, Haller and Endolastic have valued Endolastic at a $20M post-money valuation. *See* https://endolastic.com/.

**i.      Haller And Endolastic Wrongfully Co-Opt US Endoscopy's Intellectual Property, Confidential Information, And Trade Secrets To Further Endolastic's Business**

67.     Under the APA, all of Intelligent Endoscopy's intellectual property (including ***any*** inventions that Haller created during his time at Intelligent Endoscopy), confidential information, and trade secrets rightfully belong to US Endoscopy, not Haller.

68.     Despite Haller's assignment of his inventions, and subsequent agreement to sell all of Intelligent Endoscopy's intellectual property to US Endoscopy, Endolastic publicly advertises a product whose design is nearly identical to the technology acquired by US Endoscopy. Endolastic's "WindowLock" band also appears to rely upon a design, cord and bead system, barrel, and handle mechanism that are nearly identical to products in the STERIS/US Endoscopy portfolio or that Haller had worked on while employed by STERIS.

69.     Further, on May 19, 2025, Haller publicly admitted during a YouTube podcast titled "The Interventional Endoscopist" that he invented the "WindowLock" band ***while he was still employed at Intelligent Endoscopy***.

70.     Thus, because the "WindowLock" band was invented while he was employed by Intelligent Endoscopy, it falls under the technology covered by the Confidentiality and Assignment Agreement and should have been assigned to Intelligent Endoscopy and included in the Intelligent Endoscopy inventions that were sold to US Endoscopy. The "WindowLock" band invention properly belongs to US Endoscopy, ***not*** Haller or Endolastic.

71.     Haller and Endolastic used, and continue to use, US Endoscopy's ***own*** intellectual property and trade secrets to raise money from investors and ***compete directly*** with US Endoscopy. US Endoscopy ***never*** granted Haller or Endolastic permission to use any of US Endoscopy's inventions or intellectual property.

ii.     **Haller And Endolastic Also Wrongfully Co-Opt STERIS's Intellectual Property, Confidential Information, And Trade Secrets To Further Endolastic's Business**

22

72.     Under Section 5 of his Employment Agreement, Haller agreed to assign to STERIS any "Intellectual Development," meaning any "discovery, invention, improvement, innovation, design, copyright, and other definite and useful idea or compilation of information of value," that he made or originated while employed by STERIS.

73.     As set forth above, during his time with STERIS, Haller focused extensively on the use of ligation banding to treat GERD and obesity. Haller devoted a significant amount of time researching and investigating ARBM concepts for the treatment of GERD and researching and investigating EBG concepts for the treatment of obesity. Haller's proposed concepts and ligation methods focused on, among other things: using a large barrel attached to the end of an endoscope to draw in tissue and gastrointestinal muscle; applying a strong band capable of maintaining the pressure around the tissue and muscle; and cords for deploying the band over the barrel and around the polyp of tissue and gastrointestinal muscle.

74.     Pursuant to Section 5 of his Employment Agreement, these novel ligation innovations belong to STERIS, not Haller.

75.     Further, Haller did not keep the required information strictly confidential as the 2021 and 2022 Restricted Stock Agreements' Nondisclosure and Noncompetition Agreements required him to do. Instead, Haller utilized confidential information to benefit himself and on his own behalf when he created Endolastic and relied upon STERIS's and US Endoscopy's confidential information to compete in the endoscopic technology market.

76.     STERIS also never publicly disclosed any information about these novel ligation innovations. Instead, STERIS chose to retain their status as confidential trade secrets.

77.     Endolastic's website features multiple diagrams and videos of products, technology, and techniques that are virtually identical to the confidential, novel ligation techniques

23

set forth above. Indeed, Haller and Endolastic claim that Endolastic's products can treat both GERD and obesity, two metabolic conditions that Haller was keenly focused on during his employment with STERIS.

78.     Haller also explained during the May 19, 2025 YouTube podcast that his "WindowLock" bands are meant to treat GERD and obesity, the *same* conditions for which Haller developed novel ligation methods while at STERIS. He also disclosed that he filed patent applications on the "WindowLock" band, further misappropriating US Endoscopy and STERIS's trade secrets and wrongfully disclosing them to the public.

79.     On November 13, 2025, Haller discussed how Endolastic's products can treat GERD       and       obesity       during       a       ***different***       podcast.       *See* https://podofinquiry.com/2025/11/breakthrough-for-gerd-obesity/.  Haller discussed at length how Endolastic's "innovative" products can be used to treat obesity in a safer, more affordable, and less invasive manner compared to GLP-1 medications or bariatric surgeries.

80.     On information and belief, Haller developed Endolastic's near-identical, competing products by relying, at least in part, upon notes, data, photographs, and other records wrongfully retained after termination of his STERIS employment.

### iii.     Haller's Work For Endolastic Violates Four Of His Noncompetition Agreements

81.     Endolastic competes directly with US Endoscopy and STERIS by developing and selling nearly identical endoscopy technologies meant to treat GERD and obesity.

82.     Haller agreed, pursuant to the APA, not to compete with US Endoscopy for five years after December 21, 2020.

83.     Haller also agreed, pursuant to his Employment Agreement, not to compete with STERIS for one year following the termination of his employment with STERIS.

84.     Haller also agreed, pursuant to the 2021 and 2022 Nondisclosure and Noncompetition Agreements, within the LTIs, not to compete with STERIS for two years following the termination of his employment with STERIS.

85.     Upon termination, Haller did not wait for his required two-year period before engaging in a business which competes directly with STERIS in the Restricted Territories, as defined in the 2021 and 2022 Restricted Stock Agreements' Nondisclosure and Noncompetition Agreements.

86.     On information and belief, Haller also engaged in Indirect Competition with STERIS and US Endoscopy, as that term is defined in § 4(c) of the 2021 and 2022 Nondisclosure and Noncompetition Agreements, because he is an officer, director, employee, agent, and/or stockholder of Endolastic, a corporation that engages in competition with STERIS and US Endoscopy.

87.     On information and belief, Haller founded and began working for Endolastic in early 2024, well before the expiration of either of the noncompetition periods set out in the APA and his Employment Agreement. On information and belief, Haller remains employed by Endolastic today, and he actively advertises Endolastic and its copycat products and procedures to STERIS's and US Endoscopy's customer base, including endoscopists and medical equipment distributors.

## COUNT I
## BREACH OF THE ASSET PURCHASE AGREEMENT
## (US ENDOSCOPY AGAINST HALLER)

88.     Plaintiffs incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

89.     The APA is a written valid, enforceable, and binding agreement between US Endoscopy and Haller, supported by adequate consideration, for the exchange of Intelligent Endoscopy's assets for $6,000,000.

90.     US Endoscopy performed all obligations required of it under the APA.

91.     As set forth above, Haller breached multiple of his duties under of the APA, including:

a.     Breach of his duty to sell to US Endoscopy all of Intelligent Endoscopy's intellectual property, including all inventions made by Haller and assigned to Intelligent Endoscopy;

b.     Breach of his representation and warranty that the Business Intellectual Property included all of the intellectual property necessary for US Endoscopy to operate Intelligent Endoscopy, and that he did not retain any of Intelligent Endoscopy's intellectual property after the sale;

c.     Breach of his duties not to disclose Intelligent Endoscopy's or US Endoscopy's confidential information;

d.     Breach of his noncompetition agreement not to operate any business that competes with US Endoscopy until after the fifth anniversary of the APA's closing date.

92.     As the direct and proximate result of Haller's breaches, US Endoscopy has suffered significant damages in an amount to be proven at trial, but not less than $75,000.00, exclusive of interest.

93.     US Endoscopy is entitled to recover damages flowing from Haller's breach of the APA, and any other remedy available under law.

94. Under the APA, US Endoscopy is further entitled to injunctive relief to prevent further injury stemming from Haller's breach of his noncompetition obligations.

## COUNT II
## BREACH OF THE CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT
## (US ENDOSCOPY AGAINST HALLER)

95. Plaintiffs incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

96. The December 18, 2020 Confidentiality and Invention Assignment Agreement is a written valid, enforceable, and binding agreement between Intelligent Endoscopy and Haller, supported by adequate consideration.

97. Pursuant to the APA, Intelligent Endoscopy sold all Assumed Contracts, including the Confidentiality and Invention Assignment Agreement, to US Endoscopy.

98. Thus, US Endoscopy owns the Confidentiality and Invention Assignment Agreement and may enforce its rights thereunder.

99. As set forth above, Haller breached multiple of his duties under the Confidentiality and Invention Assignment Agreement, including:

   a. Breach of his duty to keep Intelligent Endoscopy's intellectual property, trade secrets, and other confidential and/or proprietary information confidential;

   b. Breach of his duty not to use Intelligent Endoscopy's intellectual property, trade secrets, and other confidential and/or proprietary information for his own benefit;

   c. Breach of his duty to assign all inventions, innovations, and/or other developments that he created during his employment with Intelligent Endoscopy to Intelligent Endoscopy.

100.    As the direct and proximate result of Haller's breaches, US Endoscopy has suffered significant damages in an amount to be proven at trial, but not less than $75,000, exclusive of interest.

101.    US Endoscopy is entitled to recover damages flowing from Haller's breach of the Confidentiality and Invention Assignment Agreement, and any other remedy available under law.

**COUNT III**
**BREACH OF THE EMPLOYMENT AGREEMENT**
**(STERIS AGAINST HALLER)**

102.    Plaintiffs incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

103.    The Employment Agreement between Haller and STERIS is a written valid, enforceable, and binding agreement, supported by adequate consideration.

104.    STERIS performed all obligations required of it under the Employment Agreement.

105.    As set forth above, Haller breached multiple of his duties under the Employment Agreement, including:

a.    Failing to return all records to STERIS immediately upon termination;

b.    Using STERIS's confidential information and Intellectual Developments to develop products for Endolastic;

c.    Competing directly with STERIS in contravention of his one-year noncompetition agreement; and

d.    Breaching his obligation to act in the best interest of his employer and engaging in self-dealing activities for himself or others during his employment.

106.    As the direct and proximate result of Haller's breach, STERIS has suffered significant damages in an amount to be proven at trial, but not less than $75,000.00, exclusive of interest.

107.    STERIS is further entitled, pursuant to the Employment Agreement, to reimbursement of its attorneys' fees and costs incurred in connection with Haller's breaches of his confidentiality and noncompetition obligations.

**COUNT IV**
**BREACH OF THE 2021 NONDISCLOSURE AND NONCOMPETITION AGREEMENT**
**(STERIS AGAINST HALLER)**

108.    Plaintiffs incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

109.    The 2021 Nondisclosure and Noncompetition Agreement between Haller and STERIS is a written valid, enforceable, and binding agreement, supported by adequate consideration.

110.    STERIS performed all obligations required of it under the 2021 Nondisclosure and Noncompetition Agreement.

111.    As set forth above, Haller breached multiple of his duties under the 2021 Nondisclosure and Noncompetition Agreement, including:

a.    Failing to at all times hold in strictest confidence confidential information of STERIS or its Affiliates;

b.    Failing to not use confidential information of STERIS or its Affiliates for Haller's own benefit or on Haller's own behalf;

c.    Failing to not disclose confidential information of STERIS or its Affiliates to any entity;

d.      Using STERIS's or its Affiliates' confidential information concerning the products researched and developed by STERIS;

e.      Competing directly with STERIS in contravention of his post-termination two-year noncompetition clause;

f.      Competing directly with STERIS by soliciting business within the Restricted Territory;

g.      Competing indirectly with STERIS, due to his status as an officer, director, employee, agent, and/or stockholder of Endolastic; and

h.      Assist financially or otherwise another entity engaged in business which competes with STERIS in the Restricted Territory.

112.      As the direct and proximate result of Haller's breach, STERIS has suffered significant damages in an amount to be proven at trial, but not less than $75,000.00, exclusive of interest.

113.      STERIS is further entitled, pursuant to the 2021 Nondisclosure and Noncompetition Agreement, injunctive relief, attorney fees, and such other relief as proper in the circumstances in connection with Haller's breaches of his confidentiality and noncompetition obligations.

**COUNT V**
**BREACH OF 2022 NONDISCLOSURE AND NONCOMPETITION AGREEMENT**
**(STERIS AGAINST HALLER)**

114.      Plaintiffs incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

115.     The 2022 Nondisclosure and Noncompetition Agreement between Haller and STERIS is a written valid, enforceable, and binding agreement, supported by adequate consideration.

116.     STERIS performed all obligations required of it under the 2022 Nondisclosure and Noncompetition Agreement.

117.     As set forth above, Haller breached multiple of his duties under the 2022 Nondisclosure and Noncompetition Agreement, including:

a.     Failing to at all times hold in strictest confidence confidential information of STERIS or its Affiliates;

b.     Failing to not use confidential information of STERIS or its Affiliates for Haller's own benefit or on Haller's own behalf;

c.     Failing to not disclose confidential information of STERIS or its Affiliates to any entity;

d.     Using STERIS's or its Affiliates' confidential information concerning the products researched and developed by STERIS;

e.     Competing directly with STERIS in contravention of his post-termination two-year noncompetition clause;

f.     Competing directly with STERIS by soliciting business within the Restricted Territory;

g.     Competing indirectly with STERIS, due to his status as an officer, director, employee, agent, and/or stockholder of Endolastic; and

h.     Assist financially or otherwise another entity engaged in business which competes with STERIS in the Restricted Territory.

31

118.    As the direct and proximate result of Haller's breach, STERIS has suffered significant damages in an amount to be proven at trial, but not less than $75,000.00, exclusive of interest.

119.    STERIS is further entitled, pursuant to the 2022 Nondisclosure and Noncompetition Agreement, injunctive relief, attorney fees, and such other relief as proper in the circumstances in connection with Haller's breaches of his confidentiality and noncompetition obligations.

**COUNT VI**
**CONVERSION**
**(US ENDOSCOPY AGAINST HALLER AND ENDOLASTIC)**

120.    STERIS and US Endoscopy incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

121.    US Endoscopy's ownership of all intellectual property assets, records, and confidential information acquired from Intelligent Endoscopy, as identified in the APA, and its right of possession of the intellectual property, records, and confidential information, is a property interest subject to conversion.

122.    US Endoscopy had clear ownership and right of possession of all Intelligent Endoscopy intellectual property, records, and confidential information, including all intellectual property and inventions previously developed by Haller and assigned to Intelligent Endoscopy, at the time of conversion.

123.    Haller's and Endolastic's continued possession, use, and refusal to release US Endoscopy's intellectual property upon demand constitutes wrongful dominion and control inconsistent with US Endoscopy's rights.

124.    US Endoscopy has been, and will continue to be, damaged as a result of Haller's and Endolastic's wrongful conversion of US Endoscopy's property rights.

125.    US Endoscopy has therefore been damaged as result of Haller's conversion of its intellectual property rights in the amount to be fully determined at trial, but in excess of $75,000.

126.    Further, Haller's and Endolastic's actions demonstrate malice or aggravated or egregious fraud. As a result of Haller's and Endolastic's actions, US Endoscopy is entitled to punitive damages.

**COUNT VII**
**CONVERSION**
**(STERIS AGAINST HALLER AND ENDOLASTIC)**

127.    Plaintiffs incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

128.    STERIS's ownership of all intellectual property developed by Haller during the course of his employment with STERIS, its records, and confidential information, and its right of possession of its intellectual property, records, and confidential information, are property interests subject to conversion.

129.    At the time of Haller's and Endolastic's conversions, STERIS had clear ownership and right of possession of all intellectual property developed by Haller during the course of his employment for STERIS.

130.    Haller's and Endolastic's continued possession, use, and refusal to release STERIS's intellectual property, records, and confidential information upon demand constitutes wrongful dominion and control inconsistent with STERIS's rights.

131.    STERIS has been and will continue to be damaged as a result of Haller's and Endolastic's wrongful conversion of STERIS's property rights.

33

132. STERIS has therefore been damaged as result of Haller's conversion of its intellectual property rights in the amount to be fully determined at trial, but in excess of $75,000.

133. Further, Haller's and Endolastic's actions demonstrate malice or aggravated or egregious fraud. As a result of Haller's and Endolastic's actions, STERIS is entitled to punitive damages.

**COUNT VIII**
**TORTIOUS INTERFERENCE**
**(US ENDOSCOPY AGAINST ENDOLASTIC)**

134. STERIS and US Endoscopy incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

135. US Endoscopy and Haller had a valid, enforceable contract for the sale of Intelligent Endoscopy's assets to US Endoscopy. Those assets included the sale of all of Intelligent Endoscopy's intellectual property, including all inventions developed by Haller and assigned to Intelligent Endoscopy, to US Endoscopy.

136. Intelligent Endoscopy and Haller further had a valid, enforceable contract obligating Haller to maintain confidentiality and assign all inventions to Intelligent Endoscopy. Intelligent Endoscopy then sold this contract to US Endoscopy as part of the asset purchase.

137. Endolastic has knowledge through Haller, and through receipt of demand letters in the fall of 2025, of the existence of the APA between US Endoscopy and Haller, and the Confidentiality and Invention Assignment Agreement between Intelligent Endoscopy and Haller, and enforceable by US Endoscopy.

138. By (1) not developing its own unique intellectual property portfolio and confidential information; (2) relying instead on Haller's knowledge of US Endoscopy's

intellectual property and confidential information; and (3) utilizing, through Haller, US Endoscopy's inventions, intellectual property, and confidential information to develop and advertise Endolastic's copycat products, Endolastic intentionally procured breach of the APA between US Endoscopy and Haller and the Confidentiality and Invention Assignment Agreement between Intelligent Endoscopy and Haller, which is enforceable by US Endoscopy.

139.    Endolastic lacked justification for its intentional interference with the APA and the Confidentiality and Invention Assignment Agreement

140.    As a result of Endolastic's conduct, US Endoscopy has suffered damages in an amount to be determined at trial, but not less than $75,000.00, exclusive of interest.

141.    Further, the conduct of Endolastic, as alleged in this count, was willful and malicious and demonstrates a complete indifference to, or a conscious disregard for, the rights of US Endoscopy, entitling US Endoscopy to an award of punitive damages.

## COUNT IX
## TORTIOUS INTERFERENCE
## (STERIS AGAINST ENDOLASTIC)

142.    STERIS and US Endoscopy incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

143.    As a condition of his employment with STERIS, Haller executed the Employment Agreement.

144.    The Employment Agreement is a valid and enforceable contract that requires Haller to (a) return all records upon termination of his employment, (b) assign all ownership rights to any inventions or other developments made by Haller in the course of his employment to STERIS, (c) keep confidential all proprietary and/or sensitive business

information learned in the course of his employment, and (d) not compete directly with STERIS for one year following termination of his employment.

145.    Haller also executed the 2021 and 2022 Restricted Stock Agreements Haller with STERIS, which included additional Nondisclosure and Noncompetition Agreements between Haller and STERIS. Under the 2021 and 2022 Restricted Stock Agreements, Haller agreed to (a) maintain strictest confidence over STERIS's and its Affiliates' confidential information, and (b) not to compete with STERIS or its Affiliates, either directly or indirectly, for two years after termination of his employment.

146.    Endolastic was aware, through Haller and demand letters sent in fall 2025, of the existence of both contracts.

147.    By (1) not developing its own unique intellectual property portfolio and confidential information; (2) relying instead on Haller's knowledge of STERIS's intellectual property and confidential information; and (3) utilizing, through Haller, STERIS's intellectual property and confidential information to develop and advertise Endolastic's copycat products, Endolastic intentionally procured breach of the Employment Agreement and the 2021 and 2022 Restricted Stock Agreements between STERIS and Haller.

148.    Endolastic lacked justification for its intentional interference with the Employment Agreement and the 2021 and 2022 Restricted Stock Agreements between STERIS and Haller.

149.    As a result of Endolastic's conduct, STERIS has suffered damages in an amount to be determined at trial, but not less than $75,000.00, exclusive of interest.

150.     Further, the conduct of Endolastic, as alleged in this count, was willful and malicious and demonstrates a complete indifference to, or a conscious disregard for, the rights of STERIS, entitling STERIS to an award of punitive damages.

**COUNT X**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**(US ENDOSCOPY AGAINST HALLER AND ENDOLASTIC)**

151.     STERIS and US Endoscopy incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

152.     US Endoscopy owns and possesses trade secrets, including trade secrets it acquired as part of its purchase of Intelligent Endoscopy and its assets. US Endoscopy's trade secrets relate to products and services used, sold, and ordered in, or intended to be used, sold, and/or ordered in, interstate and foreign commerce. Specifically, US Endoscopy's trade secrets are used to develop, manufacture, and apply endoscopic bands, which are sold to and used by medical professionals in interstate and foreign commerce throughout the United States and other countries.

153.     Haller, as a former employee and equity holder of Intelligent Endoscopy, had access to the trade secrets that he sold to US Endoscopy pursuant to the APA. Haller was under a duty to maintain the secrecy of that information and limit its use, including information regarding designs, materials, procedures, reports, and related technologies, to US Endoscopy's band development following its acquisition of Intelligent Endoscopy.

154.     Haller acquired at least the following US Endoscopy trade secret information:

     a.     Information derived from the research, testing, development, and industry expert evaluation of SMARTBAND System;

     b.     Other technical documentation and manuals related to the development and testing of SMARTBAND System and related application techniques and products;

37

c.      Written and verbal communications containing technical information about US Endoscopy's SMARTBAND System; and

d.      Particular and specific designs, dimensions, tolerances, materials, test procedures, ligation techniques, and related technologies for US Endoscopy's various band designs.

155.    US Endoscopy has never made any of these trade secrets public knowledge. The information contained in US Endoscopy's trade secrets is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use. US Endoscopy has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor. US Endoscopy's trade secrets provide it with a competitive advantage, and it derives independent economic value from its trade secrets not being generally known.

156.    At the time Haller acquired each of these trade secrets, he knew or had reason to know that he acquired the information under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret. Further, when Haller sold these trade secrets to US Endoscopy, he knew or had reason to know that US Endoscopy intended to maintain the information's trade secret status, including because the APA included a confidentiality provision under which Haller agreed not to disclose or use for his own benefit any confidential information acquired by US Endoscopy.

157.    US Endoscopy takes reasonable measures to protect its trade secrets, including at all times during its course of dealing and course of performance. Those measures include: (a) requiring execution of confidentiality agreements with suppliers, current and prospective customers, independent contractors, and STERIS personnel who are responsible for working on

US Endoscopy's portfolio of products; (b) restricting availability of certain confidential information to key employees on a need-to-know basis; (c) handbook and IT policies; and (d) sophisticated electronic protection methods on company computer and file storage systems.

158.    The APA required Haller to maintain the confidentiality of US Endoscopy's trade secrets, to not disclose the information to third parties, and to not use the information for any purpose without US Endoscopy's prior consent, in order to maintain the secrecy of US Endoscopy's trade secrets.

159.    Thus, US Endoscopy's ligation band designs, research and development information, and related confidential information constitute trade secrets owned by US Endoscopy under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3).

160.    Since at least early 2024, Haller improperly retained, used, and/or disclosed (and continues to improperly retain, use, and/or disclose) US Endoscopy's trade secrets without US Endoscopy's consent, to design, develop, test, and manufacture bands and banding techniques for Endolastic. Endolastic has endorsed Haller's conduct by failing to exercise any meaningful oversight over Haller and by benefiting directly from Haller's actions.

161.    Haller's improper retention, use, and/or disclosure of US Endoscopy's trade secrets enabled Haller to design bands for Endolastic that include many aspects of US Endoscopy's trade secrets, including copying aspects of internal and external designs, dimensions, tolerances, testing, procedures, performance, functionality, and ligation banding techniques.

162.    By improperly retaining and using US Endoscopy's trade secrets, Haller and Endolastic avoided investing the significant time, resources, and expertise required to develop ligation bands and banding techniques from scratch.

163.    Haller and Endolastic did so without US Endoscopy's knowledge or consent.

164.     Haller intentionally, willfully, and maliciously misappropriated US Endoscopy's trade secrets by supplying them to Endolastic (which Endolastic then accepted) for the design and manufacture of Endolastic's so-called "WindowLock bands." Haller accepted US Endoscopy's $6,000,000 payment for Intelligent Endoscopy's confidential trade secrets and, in return, agreed to keep US Endoscopy's newly-acquired trade secrets confidential and not to use such confidential information for his own benefit. Unsatisfied with the payment he received after this arms'-length transaction, Haller reneged on his obligations to US Endoscopy and used US Endoscopy's confidential trade secrets for his own benefit, despite knowing he was obligated to keep US Endoscopy's trade secrets confidential pursuant to the APA. Endolastic then endorsed Haller's intentional, willful, and malicious misappropriation by advertising these copycat products on Endolastic's website and soliciting money from investors based on these purported "inventions."

165.     All of the above-mentioned conduct was done without US Endoscopy's authority.

166.     Thus, the above-mentioned conduct constitutes Haller's and Endolastic's misappropriation of US Endoscopy's trade secrets under the DTSA.

167.     As a result of Haller's and Endolastic's intentional, knowing, willful, and malicious misappropriation, US Endoscopy has suffered irreparable injury and significant damages, in an amount to be determined at trial but not less than $75,000.00, exclusive of interest.

168.     US Endoscopy is further entitled to injunctive relief, including permanent injunctive relief, to prevent further injury stemming from Haller's and Endolastic's misappropriation of its trade secrets.

**COUNT XI**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**(STERIS AGAINST HALLER AND ENDOLASTIC)**

169.     Plaintiffs incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

170.     STERIS owns and possesses trade secrets. STERIS's trade secrets relate to products and services used, sold, and ordered in, or intended to be used, sold, and/or ordered in, interstate and foreign commerce. Specifically, STERIS's trade secrets are used to develop, manufacture, and apply endoscopic bands, which are sold to and used by medical professionals in interstate and foreign commerce throughout the United States and other countries.

171.     While employed by STERIS, Haller acquired, and had access to, STERIS's trade secrets. STERIS entrusted Haller with access to its trade secrets, subject to the obligations he agreed to in his Employment Agreement, including his obligation to maintain confidentiality of STERIS's proprietary or business-sensitive information, and to return all records to STERIS upon termination of his employment.

172.     While employed at STERIS, Haller acquired at least the following STERIS trade secret information:

a.     Proprietary, novel SMARTBAND System ligation banding techniques for the treatment of various metabolic conditions, including GERD and obesity;

b.     Information derived from research and testing novel SMARTBAND System ligation banding techniques, including, but not limited to, research into the possibility of using SMARTBAND System ligation to treat GERD and obesity;

c.     Proprietary STERIS technical documentation and manuals;

d.     Written and verbal communications containing technical information about STERIS's novel ligation banding techniques and related research and development; and

41

e.     Particular and specific designs, dimensions, tolerances, materials, test procedures, ligation techniques, and related technologies for the SMARTBAND System.

173.    STERIS has never made any of these ligation band-related trade secrets public knowledge. Indeed, STERIS specifically did not seek patents on the proprietary, novel SMARTBAND System ligation techniques that Haller developed because STERIS wanted to keep them as confidential trade secrets. The information contained in STERIS's trade secrets is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use. STERIS has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor. STERIS's trade secrets provide it with a competitive advantage, and it derives independent economic value from its trade secrets not being generally known.

174.    At the time Haller acquired each of these trade secrets, he knew or had reason to know that he acquired the information under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret. Pursuant to the Employment Agreement, Haller was obligated to maintain the confidentiality of STERIS's trade secrets, to not disclose the information to third parties, and to not use the information for any purpose without STERIS's prior consent, to maintain the secrecy of STERIS's trade secrets.

175.    STERIS takes reasonable measures to protect its trade secrets, including at all times during its course of dealing and course of performance. Those measures include: (a) requiring execution of confidentiality agreements with suppliers, current and prospective customers, independent contractors, and employees; (b) restricting availability of certain confidential

information to key employees on a need-to-know basis; (c) handbook and IT policies; and (d) sophisticated electronic protection methods on company computer and file storage systems.

176.    Thus, STERIS's novel SMARTBAND System ligation techniques, ligation band design, research into novel and/or potential clinical uses for SMARTBAND System, and related confidential information constitute trade secrets owned by STERIS under the DTSA, 18 U.S.C. § 1839(3).

177.    Since at least early 2024, Haller improperly retained, used, and/or disclosed (and continues to improperly retain, use, and/or disclose) STERIS's trade secrets including STERIS's novel SMARTBAND System ligation techniques, ligation band design, research into novel and/or potential clinical uses for SMARTBAND System, and related confidential information to design, develop, test, and manufacture bands and banding techniques for Endolastic. Endolastic has endorsed Haller's conduct by failing to exercise any meaningful oversight over Haller and by benefiting directly from Haller's actions.

178.    Haller's improper retention, use, and/or disclosure of STERIS's trade secrets enabled Haller to develop bands and ligation techniques on Endolastic's behalf that rely upon multiple aspects of STERIS's trade secrets.

179.    By improperly retaining and using STERIS's trade secrets, Haller and Endolastic avoided investing the significant time, resources, and expertise required to develop ligation bands and banding techniques from scratch.

180.    Haller and Endolastic did so without STERIS's knowledge or consent.

181.    Haller intentionally, willfully, and maliciously misappropriated STERIS's trade secrets by supplying them to Endolastic (which Endolastic then accepted) for the design and manufacture of Endolastic's so-called "WindowLock bands." Haller knew that he was obligated

to maintain confidentiality of STERIS's proprietary and business-sensitive information, including trade secrets, and that he was obligated to return all records to STERIS in the event his employment was terminated. Haller instead retained STERIS's records and knowingly used STERIS's trade secrets to further Endolastic's business. Endolastic then endorsed Haller's intentional, willful, and malicious misappropriation by advertising these copycat products on Endolastic's website and soliciting money from investors based on these purported "inventions."

182.    Thus, the above-mentioned conduct constitutes Haller's and Endolastic's misappropriation of STERIS's trade secrets under the DTSA.

183.    As a result of Haller's and Endolastic's intentional, knowing, willful, and malicious misappropriation, STERIS has suffered irreparable injury and significant damages, in an amount to be determined at trial but not less than $75,000.00, exclusive of interest.

184.    STERIS is further entitled to injunctive relief, including permanent injunctive relief, to prevent further injury stemming from Haller's and Endolastic's misappropriation of its trade secrets.

## COUNT XII
## VIOLATION OF THE OHIO UNIFORM TRADE SECRETS ACT
## (US ENDOSCOPY AGAINST HALLER AND ENDOLASTIC)

185.    STERIS and US Endoscopy incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

186.    The US Endoscopy information that Haller supplied to Endolastic to develop copycat products and procedures constitute trade secrets, pursuant to O.R.C. § 1333.61, because US Endoscopy derives independent economic value from such information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

187.     US Endoscopy took reasonable precautions under the circumstances to protect its trade secrets, and all parties with access to its trade secrets (including Haller) were subject to obligations to maintain their secrecy.

188.     Haller, as a former employee and equity holder of Intelligent Endoscopy, had access to the trade secrets that he sold to US Endoscopy pursuant to the APA. Haller was under a duty to maintain the secrecy of that information and limit its use, including information regarding designs, materials, procedures, reports, and related technologies, to US Endoscopy's band development following its acquisition of Intelligent Endoscopy.

189.     As set forth above, Haller acquired and/or had access to US Endoscopy trade secret information, including the following:

a.     Information derived from the research, testing, development, and industry expert evaluation of SMARTBAND System;

b.     Other technical documentation and manuals related to the development and testing of SMARTBAND System and related application techniques and products;

c.     Written and verbal communications containing technical information about US Endoscopy's SMARTBAND System; and

d.     Particular and specific designs, dimensions, tolerances, materials, test procedures, ligation techniques, and related technologies for US Endoscopy's various band designs.

190.     Thus, the above-mentioned categories of confidential US Endoscopy information constitute trade secrets owned by US Endoscopy under the Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Rev. Code Ann. § 1333.61.

45

191.     Haller and Endolastic misappropriated US Endoscopy's trade secrets when Haller improperly retained, used, and/or disclosed utilized them to form Endolastic and develop products and techniques on Endolastic's behalf. Endolastic endorsed Haller's conduct by advertising these copycat products on its website and soliciting money from investors based on its purported "inventions."

192.     Haller and Endolastic did so without US Endoscopy's knowledge or consent.

193.     Thus, Haller's and Endolastic's conduct constitutes misappropriation of US Endoscopy's trade secrets under OUTSA. Further, Haller's and Endolastic's conduct was willful, malicious, and demonstrates a complete indifference to or a conscious disregard for the rights of US Endoscopy.

194.     As a result of Haller's conduct, US Endoscopy has suffered damages in an amount to be determined at trial, but not less than $75,000.00, exclusive of interest.

195.     US Endoscopy is further entitled to injunctive relief to prevent further injury stemming from Haller's and Endolastic's misappropriation of its trade secrets.

### COUNT XIII
### VIOLATION OF THE OHIO UNIFORM TRADE SECRETS ACT
### (STERIS AGAINST HALLER AND ENDOLASTIC)

196.     STERIS and US Endoscopy incorporate by reference the above paragraphs of this Complaint as if fully stated herein.

197.     The STERIS information that Haller supplied to Endolastic to develop copycat products and procedures constitute trade secrets, pursuant to O.R.C. § 1333.61, because US Endoscopy derives independent economic value from such information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

198.     STERIS took reasonable precautions under the circumstances to protect its trade secrets, and all parties with access to its trade secrets (including Haller) were subject to obligations to maintain their secrecy.

199.     While employed by STERIS, Haller acquired, and had access to, STERIS's trade secrets. STERIS entrusted Haller with access to its trade secrets, subject to the obligations he agreed to in his Employment Agreement, including his obligation to maintain confidentiality of STERIS's proprietary or business-sensitive information, and to return all records to STERIS upon termination of his employment.

200.     As set forth above, Haller acquired and/or had access to STERIS's trade secret information, including the following:

a.      Proprietary, novel SMARTBAND System ligation banding techniques for the treatment of various metabolic conditions, including GERD and obesity;

b.      Information derived from research and testing novel SMARTBAND System ligation banding techniques, including, but not limited to, research into the possibility of using SMARTBAND System ligation to treat GERD and obesity;

c.      Proprietary STERIS technical documentation and manuals;

d.      Written and verbal communications containing technical information about STERIS's novel ligation banding techniques and related research and development; and

e.      Particular and specific designs, dimensions, tolerances, materials, test procedures, ligation techniques, and related technologies for the SMARTBAND System.

47

201. Thus, STERIS's novel SMARTBAND System ligation techniques, ligation band design, research into novel and/or potential clinical uses for SMARTBAND System, and related confidential information constitute trade secrets owned by STERIS under the Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Rev. Code Ann. § 1333.61.

202. Haller and Endolastic misappropriated STERIS's trade secrets when he utilized them to form Endolastic and develop products and techniques on Endolastic's behalf. Endolastic endorsed Haller's conduct by advertising these copycat products on its website and soliciting money from investors based on its purported "inventions."

203. Haller and Endolastic did so without STERIS's knowledge or consent.

204. Thus, Haller's and Endolastic's conduct constitutes misappropriation of STERIS's trade secrets under OUTSA. Further, Haller's and Endolastic's conduct was willful, malicious, and demonstrates a complete indifference to or a conscious disregard for the rights of US Endoscopy.

205. As a result of Haller's and Endolastic's conduct, STERIS has suffered damages in an amount to be determined at trial, but not less than $75,000.00, exclusive of interest.

206. STERIS is further entitled to injunctive relief to prevent further injury stemming from Haller's and Endolastic's misappropriation of its trade secrets.

## **PRAYER FOR RELIEF**

WHEREFORE, STERIS and US Endoscopy pray this Court for the following relief:

A. A judgment in favor of STERIS and US Endoscopy against Haller and Endolastic;

B. As to Count I, damages in the amount to be determined at trial, but not less than $75,000.00;

C.      As to Count II, damages in the amount to be determined at trial, but not less than $75,000.00;

D.      As to Count III, damages in the amount to be determined at trial, but not less than $75,000.00;

E.      As to Count IV, the amount to be determined at trial, but not less than $75,000.00;

F.      As to Count V, the amount to be determined at trial, but not less than $75,000.00;

G.      As to Count VI, the amount to be determined at trial, but not less than $75,000.00;

H.      As to Count VII, the amount to be determined at trial, but not less than $75,000.00;

I.      As to Count VIII, the amount to be determined at trial, but not less than $75,000.00;

J.      As to Count IX, the amount to be determined at trial, but not less than $75,000.00;

K.      As to Count X, the amount to be determined at trial, but not less than $75,000.00;

L.      As to Count XI, the amount to be determined at trial, but not less than $75,000.00;

M.      As to Count XII, the amount to be determined at trial, but not less than $75,000.00;

N.      As to Count XIII, the amount to be determined at trial, but not less than $75,000.00.

O.      As to each Count, an award of actual damages, including lost profits, loss of goodwill, and unjust enrichment;

P.      An award of punitive damages for each Count where punitive damages are allowed;

Q.      An award of costs for this action together with STERIS's and US Endoscopy's reasonable attorneys' fees;

R.      Reimbursement for all attorneys' fees to which STERIS is entitled under the Employment Agreement;

S.      An order for all allowable injunctive relief, including permanent injunctive relief, enjoining Haller and/or Endolastic from possession, using, disclosing, or otherwise misappropriating STERIS's or US Endoscopy's confidential information;

T.      An order reassigning to STERIS and/or US Endoscopy all patent applications and/or patents obtained by Haller and/or Endolastic for inventions that disclosed or were derived from STERIS's and/or US Endoscopy's trade secrets;

U.      An award of pre- and post-judgment interest on all damages, as allowed by law; and

V.      Any other relief deemed appropriate by the Court.

## **JURY DEMAND**

STERIS and US Endoscopy respectfully request a trial by jury of all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

Dated: December 23, 2025                  Respectfully submitted,

_/s/ Todd R. Tucker_
Todd R. Tucker
Meredith K. Collier
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114
Tel: (216) 622-8200
Fax: (216) 241-0816
Email: ttucker@calfee.com
            mcollier@calfee.com

*Counsel for Plaintiffs STERIS Corporation and US Endoscopy, Inc.*

50